# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| MARY GUTIERREZ, on her own behalf and on behalf of a class of those similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO.: 2:16-CV-111-JVB-PRC |
| CITY OF EAST CHICAGO and HOUSING AUTHORITY OF THE CITY OF EAST CHICAGO, | ) ) ) ) | |
| Defendants. | ) ) | |

## FINDINGS, REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE PURSUANT TO
## 28 U.S.C. § 636(b)(1)(B) & (C)

This matter is before the Court on a Motion for Preliminary Injunction [DE 7], filed by Plaintiff Mary Gutierrez on April 1, 2016, and a Motion for Class Certification [DE 5], filed by Plaintiff on April 1, 2016. Both motions are fully briefed and ripe for ruling.

On June 22, 2016, District Court Judge Joseph S. Van Bokkelen entered an Order [DE 36] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the instant motions pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the following reasons, the Court recommends that the District Court grant in part and deny in part the Motion for Preliminary Injunction and grant the Motion for Class Certification.

## PROCEDURAL BACKGROUND

On March 31, 2016, Plaintiff Mary Gutierrez, on her own behalf and on behalf of a class of those similarly situated, filed a class action Complaint against the Housing Authority of the City of

East Chicago ("ECHA") and the City of East Chicago, alleging that the defendants had a policy and practice of conducting warrantless searches and inspections of ECHA apartments without its tenants' consent and without probable cause or exigent circumstances in violation of the Fourth Amendment to the United States Constitution.

Defendant City of East Chicago filed an Answer on May 13, 2016, and Defendant ECHA filed an Answer on May 19, 2016.

On August 22, 2016, the Court held an evidentiary hearing on both pending motions. The same date, Plaintiff filed a Notice of Supplemental Authority.

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff asks the Court to issue a preliminary injunction enjoining Defendants from conducting nonconsensual warrantless searches and inspections of her apartment absent probable cause or exigent circumstances and enjoining enforcement of any provision of the lease agreement that allows these searches and inspections.

### A. Findings of Fact

The East Chicago Housing Authority ("ECHA") is a municipal corporation established by the City of East Chicago to manage and maintain affordable housing for city residents. ECHA owns and manages 806 units distributed among six sites located in the City of East Chicago, Indiana, one of which is the James Hunter apartment building with 109 units for elderly persons. *See* ECHA Report on Examination of Financial Statements and Supplemental Data for the Twelve Months Ended December 31, 2014, p. 4 (available at: http://echa-in.org/drupal/drupal-7.26/sites/default/files/ECHA%202016%20Annual%20Plain%20-Nov-2015.pdf) (last visited Sept. 6, 2016).

Plaintiff Mary Gutierrez is a 54 year-old resident of East Chicago, Indiana, and is a tenant of the ECHA, currently living in the James Hunter apartment building. (Pl. Ex. 2, ¶¶ 1-2). In her April 20, 2016 Affidavit, Plaintiff states that she has been a tenant of the ECHA for approximately three years. *Id*. at ¶ 2. Plaintiff is indigent, and, therefore, her rent is subsidized by ECHA. *Id*. at ¶ 3. She knows of no other place in East Chicago where she could afford to live. *Id*. Each year, ECHA conducts a re-certification and rental adjustment process that requires Plaintiff to sign a new lease. *Id*. at ¶ 4. The lease includes, among other things, a list of ECHA House Rules that Plaintiff is required to acknowledge by initialing next to each rule and signing the document. *Id*. She states that the lease, including the rules, is presented as mandatory and non-negotiable. *Id*. at ¶ 5. She states that she signs the lease because it is the only way she can access affordable housing. *Id*. In 2013, when she first signed a lease to move into the James Hunter building, she objected to a provision regarding debris removal from outside her apartment and was told that she had to initial all provisions and sign the lease or she would not be permitted to move in. *Id*. at ¶ 6.

Plaintiff signed the ECHA House Rules on June 23, 2015. (Pl. Ex. 1). Next to each of the 62 rules, she signed her initials. House Rule 52, at issue in this litigation, provides:

> I have been informed that emergency entries/inspections (i.e. heating, plumbing, and electrical or life threatening conditions) will be conducted by ECHA Staff and law enforcement and/or canine (K-9) units. Special entries/inspections (i.e. housekeeping) will be conducted by ECHA Staff and law enforcement and/or canine (K-9) units.

*Id*. at ¶ 52.

Between January 1, 2016, and April 20, 2016, Plaintiff was subjected to approximately six separate searches and inspections of her apartment conducted by ECHA employees and police officers from the East Chicago Police Department. (Pl. Ex. 2, ¶ 7). Plaintiff states in her Affidavit

that she did not give her consent to any of the six searches or inspections. *Id*. at ¶ 8. She states that at no time during any of the six searches was she shown or told of a warrant authorizing the search of her apartment; she also was not given any paperwork following the searches. *Id*. at ¶ 9. At no time during any of the searches or inspections was she told that there was an emergency that required immediate entry by ECHA or the police nor was she aware of any such emergency. *Id*. at ¶ 10.

Plaintiff states that ECHA had informed her that it would conduct mandatory routine "housekeeping" inspections once a month, but it has conducted far more searches and inspections than that. *Id*. at ¶ 11. She states that, during the inspections, ECHA examines the cleanliness of the apartment. *Id*. at ¶ 12. ECHA employees are sometimes accompanied by officers from the East Chicago Police Department when conducting the inspections. *Id*.

One of the six inspections occurred on February 5, 2016. *Id*. at ¶ 13. Plaintiff was in her apartment with a guest when she heard a knock on her door. *Id*. She answered the door to an ECHA maintenance employee and two unknown officers from the East Chicago Police Department. *Id*. Plaintiff later learned that the ECHA employee, though not in her uniform at the time, was also an officer of the East Chicago Police Department. *Id*. at ¶ 14. The ECHA employee told Plaintiff that she was there with the police officers to check the apartment in preparation for a United States Department of Housing and Urban Development ("HUD") inspection. *Id*. at ¶ 15. Plaintiff states that, without asking for permission, the ECHA employee and one of the police officers entered Plaintiff's apartment and inspected every room in the apartment. *Id*. at ¶ 16. The other officer waited outside the apartment door. *Id*. Plaintiff observed the ECHA employee check the stove, the refrigerator, three emergency call alarms, including one that is in Plaintiff's bedroom, and the bathroom plumbing. *Id*. at ¶ 17. The police officer followed the ECHA employee into each of the

rooms, including the bedroom, but Plaintiff did not see the officer touch anything. *Id*. The inspection lasted approximately five minutes, after which the ECHA employee and the two police officers left. *Id*. at ¶ 18. Plaintiff was not given any paperwork in conjunction with the inspection. *Id*. at ¶ 19.

Approximately five to ten minutes after the ECHA employee and the two police officers left, Plaintiff received another knock on her door. *Id*. at ¶ 20. Another ECHA employee as well as five unknown officers and a canine of the East Chicago Police Department were in the hallway outside her door. *Id*. Plaintiff later learned that this ECHA employee was the executive director of ECHA, Tia Cauley. *Id*. at ¶ 21. Cauley told Plaintiff to step out into the hall. Plaintiff's guest was using the bathroom at the time, so Plaintiff called out to him in Spanish and told him that they had to go into the hallway. *Id*. at ¶ 22. Cauley told Plaintiff to stop speaking Spanish. *Id*. Without asking for permission or explaining what was happening, one of the police officers entered Plaintiff's apartment with the dog and closed the door. *Id*. at ¶ 23. Plaintiff could not see what the officer was doing, but he was in the apartment for approximately fifteen minutes. *Id*.

While in the hallway, Plaintiff asked Cauley what was happening; Cauley responded that Plaintiff's apartment had been randomly picked for a drug search. *Id*. at ¶ 24. Plaintiff then asked if she could refuse the search. *Id*. at ¶ 25. Plaintiff states that Cauley told her that if she refused the searched, she would be arrested on the spot. *Id*. The four other officers were in the hallway at the time. *Id*. The ECHA employee told Plaintiff that she had an attitude. *Id*. The police officers questioned Plaintiff's guest, asking his name and using a radio to call in a background check on the guest. *Id*. at ¶ 26. The police took no further action against the guest. *Id*. After the search was complete, the ECHA employee and the officers and dog left; Plaintiff was not provided with any paperwork related to the search. *Id*. at ¶ 27.

In her Affidavit, Plaintiff states that she objects to being subject to warrantless searches and inspections without her voluntary consent and that she believes that she will be arrested or evicted if she objects to any of the searches or inspections. *Id*. at ¶ 29-30. As a result, she feels forced to submit to the searches, even though it is against her will. *Id*. at ¶ 31. She feels like a prisoner in her own home. *Id*. at ¶ 32. She states she has very little privacy in her home because it is subject to search by ECHA and the police at any time. *Id*. at ¶ 20.

In her deposition, ECHA Housing Director Tia Cauley testified that the tenants are not able to change any provision of the lease or the House Rules. (Pl. Ex. 3, pp. 19, 119). She explained that, once or twice a year, City of East Chicago police officers with K-9 units conduct investigatory searches for drugs by walking the dogs down the hallways, sometimes going into apartments. (Pl. Ex. 3, p. 5, ll. 2-4; p. 62, l. 22 - p. 64, l.2; p. 101, l. 24 - p. 102, l. 4). The entire building is searched. *Id*. at p. 64, ll. 7-13. The officers go into a unit when a dog alerts at an apartment door. *Id*. at p. 64, ll. 14-24. ECHA does not require that the officers have a warrant. *Id*. at p. 73, ll. 17-25.

For an emergency entry or inspection under House Rule 52, ECHA does not require a tenant's consent to enter the apartment. *Id*. at p. 69, ll. 3-13. For a special entry or inspection for which the tenant has been given prior written notice, ECHA does not require the tenant's consent. *Id*. at p. 69, ll. 14-17. For a housekeeping inspection, ECHA does not require the tenant's consent if a written notice has been sent. *Id*. at p. 69, l. 18 - p. 71, l. 16. ECHA does the inspection even if the tenant is not home by using a passkey. *Id*. at p. 71, ll. 17-24. ECHA does not seek an administrative warrant for any of its entries. *Id*. at p. 73, ll. 14-16.

ECHA's 2014 Amended Annual and Five Year Plan contains a section titled "Notice and Scheduling of Inspections." (Pl. Ex. 3, Cauley Dep. Ex. 4, p. 8-13) ("2014 Amended Annual and

Five Year Plan" Section 8-II.C.). As for "Notice of Entry," the ECHA Policy provides: "Any ECHA unit inspection or entry by ECHA staff may be accompanied by law enforcement and/or canine units." *Id*. For non-emergency entries, the policy provides that ECHA will notify the resident in writing at least 48 hours prior to any non-emergency inspection; that for regular annual inspections, the family will receive at least two weeks written notice of the inspection to allow the family to prepare the unit for inspection; and that entry for repairs requested by the family will not require prior notice and that resident-requested repairs presume permission for the ECHA to enter the unit. *Id*. For emergency entries, ECHA may enter the dwelling unit at any time without advance notice; if no adult household member is present at the time, ECHA must leave a written statement of the entry. *Id*. The policy provides that emergency entries will be conducted by ECHA staff and law enforcement and/or canine units. *Id*.

Finally, the policy addresses "Special Inspections/Entries" and provides: "The [ECHA] may enter the dwelling unit at any time without advance notice when there is suspected lease violation." *Id*. Examples of suspected lease violations include but are not limited to "criminal or drug related activities and [boarders]." *Id*. These entries will also be conducted by ECHA staff and law enforcement and/or canine units. *Id*. Finally, the policy provides that "[m]anagement may enter a unit, without prior notice, to perform an unscheduled inspection for those residents who have been placed on probation due to a housekeeping violation." *Id*.

In her deposition, Cauley testified that, in preparation for a HUD inspection, ECHA inspects each unit at least once a year as required by HUD, in addition to housekeeping inspections that occur monthly. (Pl. Ex. 3, pp. 38, 41-43; Pl. Ex. 4, pp. 8-11 through 8-13). Housekeeping inspections are regularly scheduled. (Pl. Ex. 3, p. 48). In her Affidavit, Cauley states that ECHA conducts routine

entries into residences for purposes of housing quality inspections, exterminations, and bedbug inspections. (Def. Ex. D, ¶ 10). At her deposition, Cauley testified that ECHA did not require Plaintiff's consent to do the annual inspection on February 5, 2016, which was the first of the two inspections of Plaintiff's apartment that day, because it was an annual inspection. (Pl. Ex. 3, p. 85, l. 24 - p. 86, l. 5).

Cauley described emergency entries to include, among other things, entering if a washing machine line becomes clogged but flooding has not yet occurred. *Id*. at p. 32-34. Cauley testified that suspected lease violations can include reports that a tenant has a dog that weighs over 20 pounds or having an unauthorized adult living in the apartment. *Id*. at pp. 49-51, 56.

During the most recent annual inspection in 2016, ECHA and the East Chicago Police Department conducted random drug searches of the apartment buildings while ECHA conducted its maintenance checks. (Pl. Ex. 3, pp. 83-84). Cauley testified that, during the search of Plaintiff's apartment, the police were present for both searches. *Id*. at 118-19. Cauley also testified that, when Cauley and the officers came back for the second inspection on February 5, 2016, and Plaintiff asked why there had been so many inspections, Cauley responded that it was in preparation for HUD's upcoming inspection and did not tell Plaintiff that the officer was searching for drugs. *Id.* at 93-94.

Cauley states in her Affidavit that, when she approached Plaintiff's residence on February 5, 2016, Plaintiff was inside her residence with the door closed after the first visit from ECHA, which Cauley did not observe. (Def. Ex. D, ¶ 4). Cauley knocked on the door, and Plaintiff opened the door and voluntarily stepped into the hallway. *Id*. at ¶ 5. Cauley states that Plaintiff had questions about the purpose of the entry into the residence but did not appear upset nor did she visibly protest. *Id*. at ¶ 6. Cauley states that Gutierrez did not appear distraught and did not have to be forced or

removed from her residence in any way, nor did she make an effort to return inside during the time that ECHA and ECPD personnel were present inside the unit. *Id*. at ¶ 7. Cauley did not observe Plaintiff being ordered out of the apartment nor did she observe Plaintiff being threatened with arrest if she failed to comply. *Id*. at ¶ 8. Cauley remained in conversation with Plaintiff throughout the duration of the search. *Id*. at ¶ 9.

In her Affidavit, Cauley explains that, in some instances, inspectors and exterminators are accompanied by law enforcement personnel; however, the typical role of law enforcement is to observe the situation from a moderate distance so as to attempt to ensure the safety of the tenant and other personnel without actually entering the residence. *Id*. at ¶ 11. Bedbug inspections may be conducted using canines that are specifically trained to detect bedbugs and are not affiliated with law enforcement. *Id*. at ¶ 12.

Javier Chavez, an employee of the ECHA, states in his Affidavit that he oversees the preparation for inspections carried out by HUD's Real Estate Assessment Center (REAC). (Def. Ex. E, ¶¶ 1-3). He states that the REAC inspections typically occur at ECHA buildings between January and March of each calendar year. *Id*. at ¶ 4. The most recent REAC inspections at the James Hunter building, where Plaintiff resides, were carried out in January and February 2016. *Id*. at ¶ 5. REAC inspection results are used to calculate scores that affect the level of oversight exercised by HUD over ECHA as well as the availability of funding for future capital projects. *Id*. at ¶ 6. To prepare for REAC inspections, ECHA engages in a process that includes an independent inspection by a contractor procured by ECHA, the generation of a listing of deficiencies following the inspection, and the repair and/or correction of the deficiencies prior to the REAC inspection. *Id*. at ¶ 9. The James Hunter building received a high enough score for 2016 such that it will not have to be

inspected by REAC contractors for three years. *Id*. at 11. However, the independent inspection and correction of deficiencies will still be conducted by ECHA personnel and contractors in order to ensure the maintenance of quality housing and identify potentially hazardous conditions. *Id*. at ¶ 12.

Plaintiff states in her Affidavit that she is "aware of other ECHA tenants who have been subject to similar warrantless searches and inspections, without their consent, and absent emergency circumstances." (Pl. Ex. 2, ¶ 34). Plaintiff does not identify any of the other tenants.

## B. Conclusions of Law

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted) (quoting 11A C. Wright, A Miller & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995)); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). A party seeking a preliminary injunction must show that she has "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (internal quotation marks omitted) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's repeated] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek*, 520 U.S. at 972).

Once this showing is made, "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The "equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

The instant motion for preliminary injunction is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution. Plaintiff asks the Court to enjoin Defendants from conducting nonconsensual warrantless searches and inspections of her apartment absent probable cause or exigent circumstances and to enjoin enforcement of any provision of the lease agreement that allows these searches and inspections.

The Fourth Amendment to the United States Constitution guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528 (1967) (quoting U.S. Const. Amend. IV). With the exception of a few "'specifically established and well-delineated exceptions,'" a warrantless search by a government actor of a person's home is "'per se unreasonable.'" *City of Los Angeles, Calif. v. Patel*, 135 S.Ct. 2443, 2452 (2015) (quoting *Arizona v. Grant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). "'It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment.'" *Fitzgerald*, 707 F.3d at 730 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)).

The warrant requirement applies equally to the administrative and criminal contexts. *Camara*, 387 U.S. at 534.

One exception to the warrant requirement is exigent circumstances. *Fitzgerald*, 707 F.3d at 730 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). "A police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search; instead, this Court conducts an objective review and we ask whether a reasonable officer had a reasonable belief that there was a compelling need to act and no time to obtain a warrant." *Id.* (quoting *Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011)). In the criminal context, one example of exigent circumstances is "[r]easonable fear for the safety of a person inside a premises." *Id.* (citing *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000); *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993)). Other examples of exigent circumstances include "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," "hot pursuit of a fleeing suspect," and "to prevent the imminent destruction of evidence." *Kentucky v. King*, 563 U.S. 452, 460 (2011). In the administrative context, exigent circumstances may include seizure of unwholesome food, compulsory smallpox vaccination, a health quarantine, or a burning building. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (citing cases).

Another exception to the warrant requirement is when an individual waives his or her Fourth Amendment rights by consenting to the search. *United States v. Rahman*, 805 F.3d 822, 831 (7th Cir. 2015) (citing *United States v. Matlock*, 415 U.S. 164 (1974)). Under the Fourth Amendment, the standard for measuring the scope of an individual's consent is "that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [person giving consent]?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

To determine whether a search was within the boundaries of consent is determined according to the "totality of the circumstances." *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994).

Consent can be express or implied. *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010) ("[C]onsent in certain cases can be implied in the absence of clear verbal permission."). The consent may be in the form of words, gesture, or conduct but must be voluntary—that is freely and intelligently given. *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976); *see also United States v. Sabo*, 724 F.3d 891, 893 (7th Cir. 2013). A party may demonstrate implied consent by physically acquiescing and remaining silent after having initially objected to a search. *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000) ("The fact that there was no direct verbal exchange between Detective Corbett and Mrs. Wesela in which she explicitly said 'it's o.k. with me for you to search the apartment,' is immaterial, as the events indicate her implicit consent."); *see also United States v. Villegas*, 388 F.3d 317 (7th Cir. 2004); *Gerald M. v. Conneely*, 858 F.2d 378, 384-85 (7th Cir. 1988); *Griffith*, 530 F.2d at 743. Whether the individual gives express or implied consent, the consent cannot be coerced "by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). "Where consent is given in response to . . . an implied threat, the consent cannot be considered voluntary." *United State v. Bolin*, 514 F.2d 554, 560 (7th Cir. 1975).

In the context of an administrative search, the United States Supreme Court held that if a tenant does not consent to a search of his or her home, and absent exigent circumstances, the government official must obtain a search warrant before conducting an administrative search or inspection. *Camara*, 387 U.S. at 540; *see also Black v. Vill. of Park Forest*, 20 F. Supp. 2d 1218, 1222 (N.D. Ill. 1998). The right to consent or not consent to a search belongs to the tenant. *See*

*Chapman v. United States*, 365 U.S. 610, 616-17 (1961); *United States v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir. 1990).

> For an administrative search, the "probable cause" requirement exists if

> reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area, but they will *not* necessarily depend upon specific knowledge of the condition of the particular dwelling.

387 U.S. at 538 (emphasis added). Thus, for purposes of an administrative search, the term "probable cause" refers "not to a quantum of evidence [necessary to obtain a warrant], but merely to a requirement of reasonableness." *Griffin v. Wisconsin*, 483 U.S. 868, 877 n.4 (1987). Put differently, "probable cause" for an administrative search "can be satisfied by demonstrating the reasonableness of the regulatory package that includes compulsory inspections." *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 578 (7th Cir. 1999).

The requirements for a warrant, whether in the criminal or administrative context, are that the warrant be "(1) under oath and describe with particularity (2) the place to be searched and (3) the persons or things to be seized." *City of Platteville*, 179 F.3d at 578 ("Although *Camara* and the other decisions that allow the use of warrants for administrative or regulatory searches modify the conventional understanding of the Fourth Amendment's 'probable cause' requirements for warrants, . . . the Supreme Court has not as yet held that the other requirements of the amendment's warrant clause . . . are to be bent for administrative warrants.").

Plaintiff seeks to enjoin both administrative and criminal searches that are warrantless and without consent or exigent circumstances. At the preliminary injunction hearing, Plaintiff clarified that she is not seeking an injunction based on her experience on February 5, 2016, but rather based

14

on House Rule 52 and the Rule 30(b)(6) deposition of ECHA Executive Director Tia Cauley. Plaintiff is not asking ECHA to stop doing inspections or for the East Chicago Police Department not to investigate criminal activity; rather, Plaintiff is asking that these tasks be done within the limits of the Fourth Amendment. The Court considers each type of search in turn.

1.    *Administrative Searches*

Plaintiff asks the Court both to enjoin ECHA's reliance on House Rule 52 as well as enjoin its practice of conducting warrantless inspections.

As for ECHA's reliance on House Rule 52, Plaintiff argues that House Rule 52 does not purport to need, nor, based on Cauley's testimony, does ECHA regularly obtain a warrant. However, a warrant is not required if the tenant consents. Nor is a warrant or consent required if there are exigent circumstances. *See United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005) (citing *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)). The plain language of House Rule 52, on its face, does not excuse the Fourth Amendment requirements of consent, exigent circumstances, or a warrant. House Rule 52 simply notifies the tenant that entries and inspections "will be conducted."

The tenant's initials next to House Rule 52 acknowledge that the tenant is aware that the entries and inspections will occur. House Rule 52 does not require the tenant to consent in advance by initialing the rule, nor could it. *Stubenfield v. Chi. Hous. Auth.*, 6 F. Supp. 3d 779, 784 (N.D. Ill. 2013) (finding that consent to drug testing as a condition for living in public housing "raises the specter of coercion"); *Peery v. Chi. Hous. Auth.*, No. 13-CV-5819, 2013 WL 6192770, at *3 (N.D. Ill. Nov. 26, 2013) (finding tenants' consent in lease to regular drug testing as a condition for living in public housing could be considered a product of duress and coercion); *Pope v. Gary Hous. Auth.*, No. 2:09-CV-301, 2012 WL 1035449, at*4 (N.D. Ind. Mar. 27, 2012) (rejecting defendants' claim

that tenants consented to warrantless criminal searches of their apartments by signing waivers in their leases). Nor does House Rule 52 constitute a waiver of Fourth Amendment rights. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586, 2596 (2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012) ("The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly."). Finally, the HUD Public Housing Guide also advises that "[t]enants cannot be asked to waive their Fourth Amendment rights.[1]

Therefore, because House Rule 52 on its face does not authorize unconstitutional searches and is no more than an acknowledgment, the Court recommends that the Motion for Preliminary Injunction be denied to the extent that Plaintiff is asking that ECHA be required to discontinue using House Rule 52.

However, Executive Director Cauley's testimony and the ECHA written policies establish that ECHA does in fact conduct warrantless searches without consent or exigent circumstances.

---

[1] The HUD Public Housing Occupancy Guidebook provides, under the heading "Entry of Dwelling Unit During Tenancy":

> Public housing tenants have the same privacy rights as tenants of other housing. The PHA cannot enter a tenant's unit except for specific reasons (described in the lease). Except for emergencies, the PHA must give at least two days' notice. The Part 966 rule expressly permits PHAs to enter tenants' units (after giving notice) to:
>
> • Perform routine inspections and maintenance;
> • Make improvements or repairs; or
> • Show the unit for re-leasing.
>
> The PHA may enter a unit at any time without notice if there is reasonable cause to believe an emergency exists (e.g., smell of gas, or water running out from under the door).
>
> > **Note:** This section of the rule does not authorize PHAs or police departments to enter units for security purposes unless the police department has a search warrant or they are in hot pursuit of a suspect who has run into the unit. Tenants cannot be asked to waive their Fourth Amendment rights.

HUD, Public Housing Occupancy Guidebook ("Public Housing Guidebook"), at 200 (June 2003) (available at: http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_10760.pdf).

Although there is a question of fact for the jury about whether Plaintiff consented to the administrative search of her apartment on February 5, 2016, Cauley testified that ECHA does not require a tenant's consent to enter an apartment (1) for an inspection under House Rule 52, (2) for a special entry or inspection for which the tenant has been given prior written notice, and (3) for a housekeeping inspection if a written notice has been sent. Cauley testified that ECHA does the inspection even if the tenant is not home by using a passkey and that ECHA does not seek an administrative warrant for any of its entries. In her deposition, Cauley explained that ECHA inspects each unit at least once a year as required by HUD, that housekeeping inspections occur monthly and are regularly scheduled, and that routine entries into residences occur for housing quality inspections, exterminations, and bedbug inspections.

This policy is further supported by ECHA's 2014 Amended Annual and Five Year Plan, which contains a section titled "Notice and Scheduling of Inspections." (Pl. Ex. 4, p. 8-13) ("2014 Amended Annual and Five Year Plan" Section 8-II.C.). For non-emergency entries, the Policy provides that ECHA will notify the resident in writing at least 48 hours prior to any non-emergency inspection; that for regular annual inspections, the family will receive at least two weeks written notice of the inspection to allow the family to prepare the unit for inspection; and that entry for repairs requested by the family will not require prior notice and that resident-requested repairs presume permission for the ECHA to enter the unit. *Id.* The Policy also provides that ECHA "may enter the dwelling unit at any time without advance notice when there is suspected lease violation." *Id.* Finally, the policy provides that "[m]anagement may enter a unit, without prior notice, to perform an unscheduled inspection for those residents who have been placed on probation due to a

housekeeping violation." *Id*. Cauley testified that ECHA did not require Plaintiff's consent for the annual inspection on February 5, 2016.

Thus, under the current ECHA practice and written policy, ECHA does not require consent for administrative inspections and does not obtain an administrative warrant. It is likely that in the vast majority of instances, the tenant gives consent for the routine HUD inspections, housekeeping inspections, housing quality inspections, exterminations, and bedbug inspections because, as tenants, they are the beneficiaries of ECHA maintaining the premises. Although advance notice is given by ECHA for many of the inspections, ECHA does not require consent; this is demonstrated by the fact that ECHA uses a master key to enter the apartment if the tenant is not home. Plaintiff states in her deposition that she did not give consent to the administrative search on February 5, 2016; notably, although Plaintiff states that she did not consent to the six searches in January and February 2016, she does not mention the various inspections for housekeeping purposes in prior years and whether or not she consented to them. Nevertheless, under the current practice and policy, tenants do not have a right to refuse the administrative search or inspection. ECHA has admitted that it conducts warrantless administrative searches and inspections without consent or exigent circumstances. All ECHA tenant apartments are subject to these searches and inspections.

At the hearing, Plaintiff acknowledged that consent is sufficient to satisfy the Fourth Amendment and asks the Court to require the administrative warrant only when there is no consent or exigent circumstances. By requiring ECHA to obtain either tenant consent, which appears likely in most instances, or a warrant when that consent is refused and when there are not exigent circumstances, ECHA will not be prevented from providing "the highest possible quality of housing to its residents and comply with HUD standards." (ECHA Br. 10). ECHA offers no explanation as

to why it cannot provide timely and sufficient maintenance and housekeeping inspections while obtaining either consent or a warrant.

At the hearing, the ECHA argued that requiring a warrant would be "superficial" or a "rubber stamp." But, this argument was rejected by the Supreme Court in *Camara*:

> It has been suggested that . . . to vary the probable cause test from the standard applied in criminal cases would be to authorize a 'synthetic search warrant' and thereby to lessen the overall protections of the Fourth Amendment. But we do not agree. The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area. It merely gives full recognition to the competing public and private interests here at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy.

387 U.S. at 538-39.

In addition, Plaintiff argues that ECHA and the City of East Chicago regularly use the administrative search process as a vehicle for its criminal searches. ECHA's written policy states that it may conduct any of its inspections and entries with police officers and drug-sniffing dogs. Cauley testified that the officers are primarily there for the safety of the tenant and the ECHA staff who enter the apartment. However, the written policy specifically provides for searches for suspected criminal or drug related activities:

> The [ECHA] may enter the dwelling unit at any time without advance notice when there is suspected lease violation . . . . *Suspected lease violations include but are not limited to: criminal or drug related activities, and [boarders].* Special entries/inspections will be conducted by ECHA Staff and law enforcement and/or canine (K-9) units.

(2014 ECHA Plan, pp. 8-13) (emphasis added). Cauley confirmed that the canines referenced by this policy refer to drug-sniffing dogs that are there to search for drugs. Thus, under the guise of administrative searches, ECHA and the City of East Chicago conduct criminal searches; as set forth fully in the following section, Plaintiff has demonstrated a likelihood of success on the merits of her claim that those warrantless drug searches are unconstitutional. Thus, any "administrative search" for lease violations that are also crimes (e.g. dogs over 20 pounds or drugs) are no longer administrative searches but criminal searches subject to the same Fourth Amendment standard but also the more strict "probable cause" requirement for obtaining a warrant.

As for the practice of having police officers accompany ECHA employees or maintenance workers during administrative searches for the safety of the employees/workers as well as the tenants, with the exception of the annual drug searches with canines, Plaintiff has not shown that ECHA and the City of East Chicago have a history of converting administrative searches into criminal searches. *See Alexander v. City and Cty. of San Francisco*, 29 F.3d 1355, 1360-61 (9th Cir. 1994). The primary purpose of the police officers at the administrative searches is to provide security; they are not conducting searches. "The Supreme Court has repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches." *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir. 1989) (citing *Camara*, 387 U.S. at 537); *see also Abel v. United States*, 362 U.S. 217, 230 (1960); *Cross v. Mokwa*, 547 F.3d 890, 889-901 (8th Cir. 2008) (dissent) (recognizing that administrative searches are subject to the Fourth Amendment's warrant requirement and finding, in opposition to the majority, that a police officer accompanying an inspector, who is on an administrative search, may not enter a home to conduct a criminal search solely because the inspector could enter to conduct the administrative

search and that the officer must obtain a criminal warrant) (citing *Michigan v. Clifford*, 464 U.S. 287, 294 (1984)); *Saleh v. City of Buffalo*, 80 F. App'x 119, 122-23 (2d Cir. 2003) (recognizing ample evidence in the record from which the jury could conclude that the search was administrative in nature and the police had accompanied the inspectors to provide security). Thus, the Court recommends that ECHA and the City of East Chicago not be precluded from utilizing police officers in a security role for administrative searches or maintenance visits so long as the search remains administrative; should the administrative search turn into a search for criminal activity, a warrant would be required.

Based on the foregoing, Plaintiff has shown a likelihood of success on the merits of her claim that ECHA's policy of entering tenants' apartments for administrative searches or inspections when there are no exigent circumstances without a warrant and without consent is unconstitutional.

Plaintiff has also demonstrated that she will suffer irreparable harm for which there is no adequate remedy because the ongoing denial of a constitutional right is irreparable harm in and of itself. *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." (citing *Burns v. Elrod*, 509 F.2d 1133 (7th Cir. 1975); *aff'd* 427 U.S. 347 (1976)); *see also Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing cases); *Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996) ("'When violations of constitutional rights are alleged, further showing of irreparable injury may not be required' if what is at stake is not monetary damages.") (quoting *Milwaukee Cty. Pavers Ass'n v. Fuedler*, 707 F. Supp. 1016, 1032 (W.D. Wis. 1989), *modified on other grounds*, 710 F. Supp. 1532. Because ECHA has both a policy and procedure that it will, multiple times a year, conduct warrantless

administrative searches of tenant apartments, including Plaintiff's, that are not contingent on tenant consent or exigent circumstances, Plaintiff and the other residents will be subject to further potentially unconstitutional searches. Because of the ongoing nature of the violations, there is no adequate remedy at law to prevent the future searches that ECHA has admitted will occur. *See Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004).

Finally, the balance of harms favors Plaintiff. Without an injunction Plaintiff will be faced with an ongoing violation of her right to be free from unconstitutional intrusions into her home. As noted above, ECHA will not be prevented from performing the necessary administrative housekeeping, maintenance, and compliance investigations by either obtaining consent or obtaining a warrant.

The public interest is served when constitutional rights are upheld. *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Preston*, 589 F.2d at 300 n.3; *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1071 (7th Cir. 1976), *on reh'g*, 548 F.2d 715 (7th Cir. 1977). And, the continued public interest in providing the best quality housing for low-income residents of the City of East Chicago will not be hindered. An injunction will only force compliance with requirements of the Fourth Amendment.

Based on the foregoing, the Court recommends that a preliminary injunction issue enjoining ECHA from conducting warrantless, nonconsensual searches of tenant apartments absent exigent circumstances and requiring ECHA to obtain consent from the tenant or, if consent is not given or cannot be obtained, to obtain a warrant for all administrative searches that are not based on exigent circumstances, including but not limited to routine HUD inspections, housekeeping inspections, housing quality inspections, exterminations, bedbug inspections, suspected lease violations, and

inspections for tenants on probation due to housekeeping violations. However, the injunction should not extend to tenant-requested maintenance requests or police accompanying an administrative search or maintenance for security purposes only.

2.    *Criminal Searches*

The evidence of record demonstrates that at least once a year, the East Chicago Police Department and the ECHA use drug-sniffing dogs to detect the scent of illegal drugs at the apartment doors in each ECHA apartment building.

Since the date Plaintiff's Motion for Preliminary Injunction was filed, the Seventh Circuit Court of Appeals has held that "the police engaged in a warrantless search within the meaning of the Fourth Amendment when they had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs." *United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016). In *Whitaker*, with the written consent of the property manager, a police officer and his drug-sniffing K9 partner walked the locked hallway of an apartment building where an individual lived who was suspected of illegal drug activity. *Id.* at 851. The dog alerted to the defendant's apartment. *Id.* Based on the canine alert, the police obtained a search warrant and returned to search the apartment, recovering cocaine, heroin, and marijuana in the apartment. *Id.*

The court in *Whitaker* discussed *Florida v. Jardines*, 133 S.Ct. 1409, 1417-18 (2013), in which the United States Supreme Court held that the government's use of a trained police dog to investigate a home and its immediate surroundings was a search under the Fourth Amendment. *Whitaker*, 820 F.3d at 853. The *Jardine* court's holding was based on the trespass of the defendant's porch, which is part of the home's curtilage and "enjoys protection as part of the home itself." *Jardines*, 133 S.Ct. at 1414. The court reasoned that the curtilage "is 'intimately linked to the home,

both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Id.* at 1415 (citing *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The court's holding was based on the trespass to the defendant's curtilage and not because of a violation of the defendant's privacy interests. *Id.* at 1417-20.

In *Whitaker*, the Seventh Circuit Court of Appeals extended the holding in *Jardines* to the hallway outside the defendant's apartment on the basis that the use of the drug-sniffing dog "clearly invaded reasonable privacy expectations," referencing Justice Kagan's concurring opinion in *Jardines* and citing *Kyllo v. United States*, 533 U.S. 27 (2001), and *Katz v. United States*, 389 U.S. 347 (1967). In *Kyllo*, the Supreme Court held that, when "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40. In *Whitaker*, the Seventh Circuit Court of Appeals held that "[a] dog search conducted from an apartment hallway comes within this rule's ambit" because it is a "sophisticated sensing device not available to the general public." 820 F.3d at 853. The fact that the search in *Whitaker* was of a home distinguished it from cases with a dog sniff in a public place. *Id.* at 853. Although Whitaker did not have a reasonable expectation of privacy in the hallway of the apartment building, he did have a reasonable expectation of privacy against "persons in the hallway snooping into his apartment using sensitive devices not available to the general public." *Id.* The court held that the police cannot take a drug-sniffing dog outside an apartment door to conduct a sniff search without a warrant. *Id.* at 854 (citing *Jardines*, 133 S.Ct. at 1416).

ECHA, with the participation of the City of East Chicago, has made the warrantless searches at issue in *Whitaker* part of its written policy, and Defendants have undertaken unconstitutional

searches of each of ECHA's approximately 800 tenants' apartments at least once a year. Plaintiff was subjected to such a search on February 5, 2016. Plaintiff states that she felt coerced to allow the second search for fear of being arrested if she withheld consent.[2] Under *Whitaker*, the constitutional violation occurs as soon as Defendants walk the drug-sniffing dog past the tenant's door. *See United States v. Sweeney*, 821 F.3d 893, 903 (7th Cir. 2016) ("[T]he dog-sniff at the entrance [is] a search of the apartment itself and subject to the Fourth Amendment warrant requirement, just as the use of other sense-enhancing technology would be.").

Whether or not a trier of fact finds that Plaintiff consented to the drug search (the second search) of her apartment on February 5, 2016, is irrelevant, as the policy is unconstitutional on its face.

Finally, Defendants' routine policy is not justified by any exigent circumstances as they are routine, scheduled drug sweeps. And, a preliminary injunction enjoining this policy will not prevent the police from entering a tenant's apartment for a criminal search based on exigent circumstances, such as being in hot pursuit of a fleeing suspect or to prevent the imminent destruction of evidence, nor will it prevent the police from obtaining a search warrant based on probable cause.

Therefore, the Court finds that Plaintiff has demonstrated a likelihood of success on the merits of her claim that the warrantless drug searches using drug-sniffing canines violate the Fourth Amendment. For the same reasons set forth in the context of the administrative searches, Plaintiff has demonstrated that she will suffer an irreparable harm for which there is no adequate remedy at law because the warrantless drug searches will continue; the balance of harms favors Plaintiff

---

[2] "Here, Peery alleges that the consequence of non-compliance with the drug testing requirement is eviction from his home. This allegation sufficiently raises the specter of coercion for this Court to infer at this stage of proceedings that plaintiffs' consent may not have been voluntary." *Peery v. Chi. Hous. Auth.*, No. 13-CV-5819, 2013 WL 6182770, at *3 (N.D. Ill. Nov. 26, 2013).

because without an injunction, she will be faced with an ongoing violation of her right to be free from warrantless criminal searches; and the public interest is served when constitutional rights are upheld. Again, an injunction will only force compliance with requirements of the Fourth Amendment.

Based on the foregoing, the Court recommends that a preliminary injunction issue requiring ECHA and the City of East Chicago to cease its warrantless drug search policy using drug-sniffing canines as well as to cease all other warrantless criminal searches without exigent circumstances or consent.

3.      *Federal Rule of Civil Procedure 65(c) - Security*

Finally, Plaintiff asks that the Court issue the preliminary injunction without requiring a bond. Federal Rule of Civil Procedure 65(c), titled "Security," provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Seventh Circuit Court of Appeals acknowledged that a district court may "waive the requirement of an injunction bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). The court reasoned, "There is no reason to require a bond in such a case." *Id*. In this case, the Court is satisfied that Defendants will not suffer any damages if the injunction issues. Defendant City of East Chicago does not acknowledge the holding in *Habitat Education Center*, and, therefore, offers no argument that it will suffer any damages if the injunction issues. ECHA did not oppose Plaintiff's request to waive the bond requirement. Therefore, Plaintiff is not required to post a bond.

## MOTION FOR CLASS CERTIFICATION

Plaintiff seeks to bring this action to challenge the alleged unconstitutional searches and inspections by Defendants on behalf of a class of similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). Plaintiff asks the Court to certify a class defined as "all current and future tenants of properties owned and managed by ECHA." (Pl. Br. 1).

Federal Rule of Civil Procedure 23(a) sets four requirements that must be met for an individual or individuals to sue on behalf of a class:

(1) The class must be so numerous that joinder of the members is impracticable;
(2) There must be questions of law or fact common to the class;
(3) The claims or defenses of the representative parties must be typical of the claims or defenses of the class; and
(4) The representative parties must fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, the class must meet the requirements of Rule 23(b)(1), (2), or (3). In this case, Plaintiff seeks certification pursuant to Rule 23(b)(2), which is met if Defendants have acted or refused to act on grounds generally applicable to the class. Fed. R. Civ. P. 23(b)(2).

As an initial matter, Defendant ECHA argues that the definition of the proposed class does not satisfy the implied "ascertainability" requirement of Rule 23 because it is "overly broad." The Seventh Circuit Court of Appeals has recently noted that for purposes of Rule 23, the implicit requirement of ascertainability requires no more than that the definition not be vague, that it not be defined by subjective criteria, and that it not be defined in terms of success on the merits. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659-61 (7th Cir. 2015), *cert denied*, 126 S.Ct. 1161 (2016). The Court finds that the class is not vague or overbroad and is ascertainable. It is defined in terms of the objective criteria of tenancy and is not based on the success on the merits. Also, the class is

properly defined to include "all individuals who by virtue of defendants' policy are likely to be subjected to the illegal conduct." *Pilliod*, 540 F.2d at 1072. The class definition is sufficient.

Turning to the explicit requirements of Rule 23(a), Plaintiff meets the numerosity requirement of Rule 23(a)(1). Courts must consider each case on its facts to determine the practicability of joining all class members. *Gen. Tel. Co. of the NW v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Although there is no minimum number of class members to meet this element, the Seventh Circuit Court of Appeals has found generally classes of 40 members to be sufficient. *See Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Flood v. Dominguez*, 270 F.R.D. 413, 417 (N.D. Ind. 2010). ECHA owns and manages 806 units at six sites in East Chicago; 85% of the units are occupied. As part of the lease, all tenants are required to sign an acknowledgment of ECHA's "House Rules," including House Rule 52. If 85% of the 806 units are occupied by one or more persons, there are approximately 645 potential class members. That number is large enough to make joining all potential class members impracticable.

Second, Plaintiff meets the commonality requirement of 23(a)(2). Commonality means that "determining the truth or falsity of [a] common contention will resolve an issue that is central to the validity of the each claim." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("What matters to class certification . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (quotation omitted)). In this case, Plaintiff and all putative class members are subject to the administrative searches as well as the drug sweeps. Thus, they are united by the common question of whether ECHA's policies and practices violate the Fourth Amendment's prohibition on

unreasonable searches and seizures. Contrary to the City of East Chicago's contention, the case will not require an examination of the separate facts of each tenant's consent. The common question is not whether each individual class member experienced an unconstitutional search but rather whether Defendants maintain a policy and practice of warrantless searches and inspections of tenant apartments that goes beyond the clearly delineated exceptions for voluntary consent and exigent circumstances.

Third, Plaintiff has satisfied the typicality requirement of Rule 23(a)(3), which requires that her claims as representative be typical of the claims of the class. When the class representative's claims have "the same essential characteristics" as the class members' claims, then typicality is met. *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). In this case, Plaintiff's claims for injunctive relief are identical to those of the proposed class. There is a uniform policy and practice affecting all class members, namely that all tenants in the ECHA apartments are subject to administrative or criminal searches conducted without a warrant, consent, or exigent circumstances.

Finally, Plaintiff is an adequate representative under Rule 23(a)(4), which requires that she will fairly and adequately protect the interests of the class. This inquiry considers (1) whether the class representative's interests are aligned with those of the class and (2) whether class counsel is capable of litigating the case. The relief Plaintiff seeks is not inconsistent with or antagonistic to the interests of the class members. *See Spano v. The Boeing Co.*, 633 F.3d 574, 586-87 (7th Cir. 2011). Again, Plaintiff's claims for injunctive relief are essentially identical to those of the proposed class. Defendants argue that class certification is precluded because "Fourth Amendment rights are personal rights which may not be vicariously asserted." (Def. City of Each Chicago Resp. 8; Def. ECHA Resp. 19). However, with the addition of Rule 23(b)(2), there is no disagreement on the

propriety of bringing a class action to vindicate the constitutional rights of others. *Alderman v. Untied States*, 394 U.S. 165 (1969), cited by Defendant City of East Chicago, was not a class action. Last, there is no reason to doubt the competency or motives of class counsel.

Because Plaintiff meets all the required elements of Rule 23(a), the Court turns to Rule 23(b)(2), which requires that the party who opposes the class must have "acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief if appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of Rule 23(b)(2) classes." *Chi. Teachers Union, Local No. 1*, 797 F.3d at 441 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). In this case, Plaintiff alleges that Defendants' alleged policy and practice of conducting nonconsensual and warrantless searches has detrimentally affected and will continue to detrimentally affect Plaintiff as well as the members of the putative class; it is these practices Plaintiff seeks to enjoin. Plaintiff is not seeking damages on behalf of the class and she is not challenging the constitutionality of uniquely different searches. Plaintiff's request for money damages for herself are incidental to the requested equitable relief. *See Gesell v. Commonwealth Edison Co.*, 216 F.R.D. 626 (C.D. Ill. 2003 (citing *Lemon v. Int'l Union Operating Eng'rs Local 139*, 216 F.3d 577, 580 (7th Cir. 2000)). Plaintiff has met the requirements of Rule 23(b)(2).

At the hearing, ECHA argued that class certification should not be granted because a class is not necessary to grant the requested injunctive relief. However, the Seventh Circuit Court of Appeals has held that, if the requirements of Rule 23 are satisfied, class certification may not be refused because of lack of "need." *Fujishima v. Bd. of Ed.*, 460 F.2d 1355, 1360 (7th Cir. 1975) (Rule 23(b)(2) class) ("[A] court may not deny class status because there is no 'need' for it."); *see*

*also Brown v. Scott*, 602 F.2d 791, 795 (7th Cir. 1991) (Rule 23(b)(2) class); *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978) (Rule 23(b)(2) class); *Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir. 1976) (Rule 23(b)(2) class).

Therefore, the Court recommends that the Motion for Class Certification be granted and that the following class be certified: "All current and future tenants of properties owned and managed by ECHA." The Court further recommends that Plaintiff's counsel be appointed as counsel for the class pursuant to Federal Rule of Civil Procedure 23(g).

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **GRANT in part and DENY in part** the Motion for Preliminary Injunction [DE 7] and **GRANT** the Motion for Class Certification [DE 5].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 6th day of September, 2016.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT